Fuchsberg, J.
(dissenting). We are here called upon to construe so much of the Human Rights Law as prohibits an employer from discriminating against any individual by reason of a disability unrelated to his employment (Executive Law, § 292, subd 21). A subsidiary question, here hardly contestable, is whether, if the employment may be deemed unrelated, the State Division of Human Rights’ finding of discrimination was supported by substantial evidence.
The issues come to us on appeal from an order of the Appellate Division annulling a determination of the State Human Rights Appeal Board, which affirmed an order of the Human Rights Division directing the petitioner Averill Park Central School District to offer the complainant, Leo M. Vissa, reinstatement to the position of school bus driver. For the reasons that follow, I would reverse the order of the Appellate Division and restore the order of the Human Rights Division.
Since the facts — essentially undisputed — pragmatically, pertinently and precisely epitomize the kind of problem the statute was enacted to meet, I start with their recital:
Vissa had been employed by the district as a bus driver for 12 years. He was always an exemplary employee. Specifically, among other things, he had never been involved in an accident, never received a traffic summons and never been the *952 subject of unfavorable comment by students, parents or school authorities.
In August, 1974, a routine hearing test was administered to him by a school nurse, who undisputably had no special competency in auditory matters. Solely on the basis of her report, which showed a hearing loss at frequencies higher than 4,000 cycles per second, and without making any independent examination of his own, the school physician, a general practitioner without any particular training in otolaryngology, determined that, though Vissa’s hearing was "adequate” at normal speech levels, he was physically unfit to perform the duties of a bus driver.[1] Thereupon the school district, without more, demoted him to a custodial job at a lower salary. This is the sum total of the evidence of the disability presented by the school authorities at the public hearing subsequently conducted by the Division of Human Rights.
In contrast, the opposing proof was overwhelming. Though Vissa’s hearing had tested imperfectly for years, it had not adversely affected his work, as his performance bore out. Moreover, his condition apparently was not progressive, for only two months before the nurse’s examination which the school physician chose to adopt, Vissa’s hearing had been tested by the Veterans’ Administration hospital and found essentially unchanged, if not improved, from what it had been four years earlier. Indeed, in the two years preceding his demotion he had passed the annual hearing tests conducted by other school nurses with flying colors. Above all, at the Human Rights hearing, three highly qualified specialists, one associated with the VA hospital that had tested Vissa’s hearing in 1974 and 1975, the second the chief of otolaryngology at the VA hospital, and the third the chief research consultant to the New York League for the Hard of Hearing and a celebrated expert in the field of environmental noise, all unequivocally rejected the school doctor’s conclusion. Their unimpeached testimony established that every sound a bus driver must be able to hear in order to drive safely includes *953 low-frequency and medium-frequency components, both well within Vissa’s range of hearing, that there was no environmental noise Vissa would not be able to hear, that the most critical frequencies of emergency or distress signals range from 500 through 2,000 cps, that warning devices are designed to emit noise around the 500 to 2,000 and not the 4,000 range, that the tests adopted by the Federal Highway Administration for drivers of interstate buses do not go beyond 2,000 cps, that Vissa’s hearing easily met these standards, and that there was no acoustical contingency that might arise which would be inaudible to him.
Tellingly, any serious assertion that Vissa’s hearing impairment interfered in any way with his work as a school bus driver was eliminated on cross-examination of the school physician. The good doctor not only agreed that Vissa could hear the low- and middle-frequency components of sounds emitted across the frequency range, but he candidly admitted his ignorance of whether warning sounds emitted only in a high frequency were also concomitantly emitted in the low and middle frequencies. Finally, after the conclusion of the public hearing but before the Division of Human Rights issued its order, New York State’s Department of Motor Vehicles adopted the Federal standard for the licensing of school bus drivers (15 NYCRR 6.11 [b] [11], 6.12 [c], 6.13) and the State Department of Education has followed suit (8 NYCRR 156.3 [c] [l]).[2]
On this record and in face of the injunction that the Human Rights Law, as remedial legislation, be construed liberally (Executive Law, §§ 290, 300), the Appellate Division found it necessary to rely on what I respectfully suggest is an erroneous interpretation of the exclusionary phrase “unrelated activity” as it appears in subdivision 21 of section 292 of the statute. That section, whose construction is therefore at the heart of this appeal reads in pertinent part: “The term 'disability’ means a[n] * * * impairment * * * provided however, * * * the term shall be limited to * * * conditions which are unrelated to the ability to engage in the activities involved in the job or occupation which a person claiming protection of this article shall be seeking”. Ignoring the principle that the *954 proviso, as an exception, ordinarily would "be strictly construed in order that the major policy underlying the legislation itself is not defeated” (see McKinney’s Cons Laws of NY, Book 1, Statutes, § 213; 2A Sutherland, Statutory Construction [4th ed], §§ 47.08, 47.11), the court found an intent to broadly exclude disabilities that conceptually could be said to be related in any way to the job in question, without regard to whether it did so in a particular complainant’s case. In its view, because some hearing defects conceivably could make it unsafe to drive a school bus, even those drivers whose hearing defects do not in fact interfere in any way whatsoever with their abilities to hear everything their jobs require are nevertheless also to be left unprotected by the Human Rights Law.
On the other hand, the Division of Human Rights contends that, in order for the exclusionary proviso in the statute to come into play, the disability to which it is sought to be applied must be one rendering the particular disabled person unable, in whole or in part, to perform the duties of the job or occupation involved. On such an analysis, requiring a determination that the specific individual involved is in fact vocationally incapacitated, Vissa’s high frequency hearing loss would not come within the exclusionary proviso since it did not prevent him from carrying out his duties in a perfectly satisfactory manner.
It seems to me that we are required to adopt the interpretation offered by the Human Rights Division and to reject the one put forth by the Appellate Division. In the first place, the latter’s approach is not consonant with subdivision 21 of section 292’s legislative history. Secondly, it would seriously undermine the Human Rights Division’s ability to protect our disabled citizens from employment discrimination. And, thirdly, in the light of what the statute was intended to accomplish, I do not believe it accords with reality.
Taking up these matters in reverse order, I start by observing the obvious — that the proviso was to effect a balance between the right of a disabled person to be free from discrimination and the right of an employer to hire only those persons who are "able to engage in the activities involved in the job”. So, had Vissa’s loss of hearing been such as to interfere with his ability to perform his job, the school district would have been justified in removing him. However, the relationship test postulated by the section cannot have been intended to be so general and so permissive that it would all
*955 but invite certain employers to evade the underlying statutory design with impunity, even when, for instance, such employers are motivated by nothing worse than a reluctance to go to the trouble of ascertaining whether what in theory may be a disability interfering with normal work performance in fact has no such effect at all or, by reasonable and simple accommodation, may be overcome completely (cf. Davis v Southeastern Community Coll., 424 F Supp 1341, 1345 [construing 1973 Rehabilitation Act, US Code, tit 29, § 794 et seq.]; Administrative Code of the City of New York, §§ Bl-7.0, Bl-7.1 [City Comm on Human Rights], [exception for bona fide occupational qualifications]).
To the contrary, if the over-all statutory scheme had any purpose at all, it must have been to eliminate the barriers that over and over again have deprived handicapped people of the opportunity to enter the job market on a basis consistent with their true aptitudes. It is understandable that an employer would often be blinded to a handicapped applicant’s worth by the imagined fear that the disability would render him or her less competent or a greater source of liability. Fueled by differences that were confused with disabilities, an indiscriminate broadbrush of exclusion would unnecessarily condemn literally millions of persons to unproductive lives while the Nation itself was the poorer for being deprived of their potential contributions to society (see, generally, Fitch, Vocational Guidance in Action; Anderson, The Disabled Man and His Vocational Adjustment). The immensity of this problem is not to be overestimated. Very pointedly for the present case, in excess of lAVi million Americans suffer from impaired hearing alone, a figure that should not be surprising in a world where few adults are perfect physical specimens (Bruck, Access, The Guide to A Better Life for Disabled Americans, p 151).
Turning now to the legislative history, while it could have been more explicit, the clues that emanate from the Senate bill jacket (S 4524B, L 1974, ch 988) reflect a consistent concern that the competence of disabled individuals not be ignored. In this regard, explanatory communications to the Governor from sponsors of the legislation are most revealing. They disclose an intent completely at odds with the one which the court below has divined. For example, one describes the proviso as protecting the employer’s "justifiable concern for the disabled or handicapped person whose medical condition *956 would prevent him from carrying out his job duties”. Another informs the Governor that the intention of the proviso was merely to permit an employer to take "into account a person’s physical handicap if such handicap made it impossible for a person to perform the job. ” The substance of this thinking was echoed in Governor Malcolm Wilson’s own memorandum of approval, in which he took pains to emphasize that the proviso excepted only hiring practices that took the capacities of "individual” employees into account. Said the Governor, "the intent of this legislation is clear in preserving and promoting * * * practices which emphasize the capacity of the individual and his worth as a prospective employee, by abrogating employment practices which blind an employer to the job applicant’s individual worth because of a disability which is unrelated to his capability to perform the job” (1974 McKinney’s Session Laws of New York, p 2123). (Emphasis mine.)
Furthermore, if, despite all these telltale traces, there were still doubt as to the meaning of the statutory language, on the record here it cannot be said that the interpretation given it by the Human Rights Division, the highly specialized agency charged with its enforcement, was irrational (Matter of Howard v Wyman, 28 NY2d 434, 438; Davis, Administrative Law of the Seventies, § 30.00). Especially is this so, in view of the fact that the legislative bill jacket also contains memoranda from various government agencies[3] indicating the need for specifying procedures for which determinations under the section were to be made; the Governor’s approval of the legislation despite the interpretative problems almost necessarily indicated expected reliance on the enforcing body.
In sum, the Division of Human Rights was warranted in concluding (1) that for a disability to be one "unrelated to the ability to engage in the activities involved in [a] job or occupation” it has to be one based on a demonstrated incapacity of an individual to handle a particular job and (2) that there was even more than substantial evidence that Vissa’s hearing loss did not interfere with his ability to hear anything he needed to have heard in order to drive a school bus.
Order affirmed, etc.

. Frequency, or pitch, is determined by the speed at which sound is emitted. Such speed is measured in cycles per second ("cps”). The higher the frequency or pitch, the greater the number of cycles per second. The so-called "speech range” runs from 500 through 2,000 cps. The highest note on the standard piano keyboard, when tuned to concert pitch, emits a sound at 4,096 cps. (See Concise Oxford Dictionary of Music, "Acoustics (13)” [2d ed], 1964.)

. Assuming that, because adopted post hoc, these regulations technically are not part of the record, the division made clear in bringing them to our attention that it regards its order as permitting the school district to retest Vissa thereunder before actually reinstating him.

. See Department of Civil Service memorandum, dated April 16, 1974; Department of Education memorandum, dated April 19, 1974; Department of Labor memorandum, dated Arpil 26, 1974; Consumer Protection Board memorandum, dated May 1, 1974, relating to S 4524B. All of these are contained in the bill jacket.